UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

In re                                          Chapter 11
Great Lakes Quick Lube
Limited Partnership,                           Case No. 12-24163-svk
        Debtor.

---

Official Committee of Unsecured
Creditors of Great Lakes Quick Lube, L.P.,

        Plaintiff,
v.                                             Adv. No. 13-2709

T.D. Investments I, LLP,

        Defendant.

---

## MEMORANDUM DECISION

---

The Official Committee of Unsecured Creditors of Great Lakes Quick Lube, L.P. (the "Committee") brought this action against T.D. Investments I, LLP ("T.D.") seeking to avoid a lease termination transaction as a preference or fraudulent transfer. The Committee's standing to pursue these claims is grounded in the confirmed Chapter 11 plan of Great Lakes Quick Lube Limited Partnership (the "Debtor").

## FACTS

In the lease termination agreement, the Debtor agreed to relinquish its leasehold interests in five oil change stores. (Sub-lease and Lease Termination Agreement, ECF 46-1.) The stores were located in Cottage Grove, Madison, West Allis, Brookfield and Waukesha, Wisconsin. In exchange for its surrender of the stores, the landlords released the Debtor from all past and future obligations for rent, deferred maintenance, real estate taxes and other expense payments.

This adversary proceeding concerns the terminated subleases for two stores: the store located at 3108 S. 108th Street, West Allis, Wisconsin (the "Store 22 Sublease") and the store located at 600 Woelfel Road, Brookfield, Wisconsin (the "Store 25 Sublease"). (Complaint, ECF 1 at ¶¶ 11, 15.) The parties initially entered into the Store 22 Sublease on November 5, 2004. (Amended Stipulation of Facts, ECF 53 at ¶ 5.) They extended the Store 22 Sublease several times with the final extension set to expire on November 9, 2014. (*Id.* at ¶¶ 6, 7, 8.) The parties entered into the Store 25 Sublease on November 5, 2004. (*Id.* at ¶ 9.) On April 27, 2006, the Debtor gave notice to T.D. that it intended to extend the term of the Store 25 Sublease until September 30, 2020. (*Id.* at ¶ 10.) However, the Debtor's president, James Wheat, was under the impression that the Store 25 sublease was scheduled to expire much sooner. (Trial Audio 10:40:28 – 10:41:17.)

John Theisen testified on behalf of T.D. that the Debtor was in default on the obligations on the Store 22 and Store 25 subleases. (*Id.* 10:48:25 – 10:48:33.) There is no dispute that the Debtor was in default for failure to pay January rent on the Cottage Grove store, as confirmed in an email from Theisen to Wheat. (Trial Exhibit 31, ECF 46-31.) In addition, Wheat testified that he thought there were only two years left on the Store 22 sublease and three years left on the Store 25 sublease. (*Id.* 10:40:28 – 10:41:17.) The Debtor's franchisor, Valvoline, was asking for new 15-year licensing agreements, and the Debtor was "confident" it would lose Store 22 in two years. (*Id.*) Wheat believed that the Debtor owed approximately $50,000 in overdue rent and real estate taxes for the five stores and that T.D. would pursue eviction. (*Id.* 10:04:48 – 10:06:09.) The parties stipulated that as of February 11, 2012, the unpaid balance on the Store 22 Sublease was $2,903.67, and the unpaid balance on the Store 25 Sublease was $10,431.09. (ECF 53 at 4.) In addition to the past due rent and taxes, Wheat testified that the stores needed

2

significant repairs, and T.D. was pressing for those to be made at the Debtor's expense, as required by the subleases. Wheat estimated the Store 22 repairs at $25,000, and the Store 25 repairs at $15,000 to $20,000. (Trial Audio 10:06:41 – 10:08:34.) Wheat testified that T.D. sent default notices, but he could not remember whether the notices were for Stores 22 and 25, or others in the group that were part of the termination agreement. (*Id.* 10:09:18 – 10:09:31.) He recalled that for at least 12 months, the Debtor was unable to pay its debts as they came due and was not creating enough cash flow to keep up with obligations to most landlords and vendors. (*Id.* 9:47:50 – 9:48:42). Wheat and the Debtor's management were in constant communication and negotiation with landlords and vendors trying to determine who was willing to wait a little longer or accept partial payments. According to Wheat, the Debtor was trying to keep operations going forward and stay out of bankruptcy. (*Id.* 9:48:56-9:49:24.)

When Theisen contacted Wheat about terminating the subleases, the Debtor was considering bankruptcy but was trying to avoid it. (*Id.* 9:56:43 – 9:56:56.) Wheat testified that T.D. was a very demanding landlord group, and the relationship between the Debtor and T.D. was strained. (*Id.* 10:19:11 – 10:20:23.) Wheat was concerned that T.D.'s actions to evict the Debtor would force the Debtor into bankruptcy prematurely, before the Debtor could secure new investors or capital, and possibly stave off a bankruptcy filing. (*Id.* at 10:42:03 – 10:42:55.)

Given T.D.'s aggressiveness, Wheat's understanding that the subleases had only two or three years to run, and the desire to avoid bankruptcy, Wheat decided that severing the relationship with T.D. was a good business decision, and he did not regret it. (*Id.*; 11:13:32 – 11:13:41.) On February 10, 2012, the Debtor and T.D. entered into the lease termination agreement. (ECF 53 at ¶ 11.)

3

The Debtor was unable to avoid bankruptcy, and on April 2, 2012, the Debtor filed a Chapter 11 petition. On April 6, 2012, the Debtor filed an amended motion to reject certain leases, including the Store 22 and Store 25 subleases. (12-24163-svk, ECF 48.) In that motion, the Debtor explained that it had expanded rapidly, reaching a high water mark of 107 oil change stores. But by 2011, factors such as the economy, high gas prices and problems with maintaining sources of operating capital strained the Debtor's business. Concluding that they were underperforming and losing money, between July 2011 and the Chapter 11 petition, the Debtor closed 43 stores. The amended motion stated: "Termination agreements are in place regarding 15 of the leases. See Exhibit B. All of the affected leases relate to locations where the Debtor is no longer operating and have [sic] removed its property. The Debtor seeks authority to reject all leases identified on Exhibit A (the "Rejected Leases") to the extent leases have not otherwise been terminated. The Rejected Leases are not necessary for continued operations and are a burden on the Estate . . ." (*Id.* at ¶ 13.) No objections were filed to the motion to reject the leases, and on May 7, 2012, the Court entered an order approving the rejection of the leases, including the Store 22 and Store 25 Subleases. (12-24163-svk, ECF 111.)

On January 30, 2013, the Court confirmed the Debtor's Third Amended Plan of Reorganization, assigning the ability to pursue certain claims and causes of action to the Committee. The Committee filed this adversary proceeding against T.D. on September 16, 2013. The Complaint contends that the value of the Store 22 and Store 25 subleases to the Debtor's estate was at least $825,000, and seeks at least that amount, plus interest, costs and attorneys' fees from T.D. After the Court denied the Committee's motion for summary judgment -- finding that whether the lease termination was an avoidable transfer could not be decided as a matter of law -- the Court held a trial on November 12 and 13, 2014. In lieu of closing arguments, the

parties filed post-trial briefs. The Court has considered those briefs and reviewed the stipulated facts, trial testimony and exhibits. This Memorandum Decision constitutes the Court's findings of fact and conclusions of law.

## ANALYSIS

The Committee's avoidance claims are based on 11 U.S.C. §§ 547(b) and 548(a)(1)(B). Both provisions require that a "transfer" occur; thus, the first issue is whether the termination agreement was a transfer under the Bankruptcy Code.

### I. Termination of a lease as an avoidable "transfer"

The Bankruptcy Code defines the term "transfer" extremely broadly, to encompass "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with . . . an interest in property." 11 U.S.C. § 101(54)(D). In spite of this definition, many courts have held that the termination of a lease or executory contract is not a transfer for purposes of the avoidance statutes. For example, in *In re Jermoo's, Inc.*, 38 B.R. 197 (Bankr. W.D. Wis. 1984), the debtor operated gasoline stations under a franchise agreement with Amoco Oil Company. Under the agreement, Amoco could terminate the debtor's franchise if it failed to cure dishonored checks after a grace period. When checks were dishonored and the debtor failed to cure, Amoco issued a letter terminating the dealerships, effective in 90 days. The debtor filed a Chapter 11 petition before the 90-day period ran, and the creditors' committee sued Amoco to avoid the termination of the contracts as a fraudulent transfer under § 548(a)(2) of the Bankruptcy Code.

Judge Martin commented on the surprising lack of case law addressing contract terminations as fraudulent transfers and observed that "[s]ince it is reasonable to assume that a great many executory contracts were terminated against insolvent debtors prior to bankruptcy

5

filings, the nearly total silence of the courts strongly suggests a continuing practical construction of the fraudulent transfer statute by the bench and bar which excludes from the statute rightful terminations of operating agreements." *Id.* at 203-04. The court focused on the operation of rights that are affected when property is transferred, noting that "[w]hen property, real, tangible, or intangible, is transferred, the property itself is not transformed by the exchange. The termination of the right to perform on an executory contract, according to the terms of that contract, differs from a transfer of property in this sense: the rights terminated, unlike property, are transformed. At the option of the terminating party, the rights may simply disappear, or as with other kinds of property, may be dispersed, reconveyed or retained." *Id.* at 204.

Since the purpose of fraudulent transfer law is to prevent loss to creditors upon execution of a judgment, "it is hard to imagine execution upon a debtor's right to continue in business under a dealership contract. Since no creditor could readily seize a franchisee's right to continue operation in general, *a fortiori* it could not be done when such a right has been terminated according to the terms of the agreement which creates it." *Id.* at 206; s*ee also In re Commodity Merchs., Inc.*, 538 F.2d 1260, 1263 (7th Cir. 1976) (finding where no valuable property right existed at time of cancellation of contract, then no "transfer" of property occurred). Therefore, termination did not constitute an avoidable transfer.

## II. Application of § 365(c)(3)

Ten years later in *In re Egyptian Bros. Donut*, 190 B.R. 26, 28 (Bankr. D.N.J. 1995), the court recognized a "substantial" body of case law supporting the position that a pre-petition termination of an executory contract constitutes a "transfer". *Egyptian Bros.* involved the pre-petition termination of franchise and lease agreements for two Dunkin' Donuts stores. The debtors had defaulted, and Dunkin' Donuts sent notices and commenced an action to declare that

6

the franchise and lease agreements had been terminated. The parties reached a court-approved settlement, requiring the debtors to make certain payments or a writ of possession would issue for the stores. After defaulting on the settlement agreement, the debtors filed Chapter 11 petitions and attempted to avoid the termination of the franchise and lease agreements as preferences or fraudulent transfers under §§ 547 and 548.

The court declined to follow the line of cases deeming a pre-petition lease termination an avoidable transfer, calling that interpretation of §§ 547 and 548 "overly broad." *Id.* at 29. The court's analysis focused on Bankruptcy Code § 365(c)(3), which prohibits the debtor in possession's assumption of nonresidential leases that have been terminated under nonbankruptcy law prior to the petition: "Some courts have determined that this section does not prohibit a trustee or debtor from assuming an agreement terminated prepetition, if that termination constitutes an avoidable transfer under §§ 547 or 548. This court finds more persuasive those cases which have held that a debtor or trustee cannot assume an agreement which was terminated by its terms pre-petition because of a material default." *Id.* (internal citation omitted). Among the cases that persuaded the court was *Jermoo's*, in which Judge Martin observed:

> The structure of the Bankruptcy Code reflects this understanding of the difference between the loss of rights under an executory contract and other transfers of property. A separate section (11 U.S.C. § 365) governs the treatment of executory contracts. It would be anomalous, to say the least, to expect that the drafters of a generally thrifty codification of bankruptcy law would devote a substantial section of the Code to the subject of the assumption or rejection of executory contracts and unexpired leases, while at the same time allowing a portion of that subject to spill over into the section governing fraudulent transfers and obligations. . . . A statute should be construed as a harmonious whole. 73 Am. Jur. 2d, *Statutes*, § 191 (1974). This is even truer of a Code. The general language of § 548 must be read harmoniously with the rest of the Code, including § 365 (and § 108) in order to give effect to the legislative intent.

*Id.* at 30 (quoting *Jermoo's,* 38 B.R. at 204).

The court in *Egyptian Bros.* held that while the literal definition of "transfer" encompasses termination of a franchise agreement or lease, authorizing the avoidance of the termination as a preference or fraudulent transfer is inconsistent with the statutory framework, i.e., the operation of § 365(c)(3), when the contract or lease was validly terminated pre-petition. *Id.; see also Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1214 (7th Cir. 1984) ("Where a contract has been validly terminated pre-bankruptcy, the debtors' rights to continued performance under the contract have expired. The filing of a petition under chapter 11 cannot resuscitate those rights."); *Metro Water & Coffee Servs. v. Rochester Cmty. Baseball* (*In re Metro Water & Coffee Servs.*), 157 B.R. 742 (Bankr. W.D.N.Y 1993) (although a pre-petition termination of an executory contract is technically a transfer, the termination could not be avoided because there was no proof of collusion between the parties resulting in prejudice of the debtor's estate or its creditors).

This Court agrees. Although arguably not as clear for an executory contract or residential lease that has terminated pre-petition, if a nonresidential lease has been terminated under state law prior to the petition, the termination is not an avoidable transfer under § 547 or § 548 of the Bankruptcy Code. The specific statutory provision regarding validly terminated nonresidential leases in § 365(c)(3) must control over the more general statutes allowing the avoidance of preferences and fraudulent transfers. *Haines v. Regina C. Dixon Trust (In re Haines)*, 178 B.R. 471, 474 (Bankr. W.D. Mo. 1995) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992)). On the basis of § 365(c)(3) and policy considerations, the court in *Haines* rejected an attempt to avoid the pre-petition termination of a lease as a fraudulent transfer. The subleases in this case were validly terminated under Wisconsin law. *See* Wis. Stat. § 704.03. Accordingly, they could not have been assumed for the benefit of the Debtor's creditors under § 365(c)(3). As

in *Jermoo's*, there was nothing for the creditors to realize on after the termination of the subleases, and therefore no fraudulent transfer claim for the Committee to pursue.

### III. Avoidance of non-collusive termination agreements

*Haines* and *Egyptian Bros.* involve terminations that occurred after the landlord sued the debtor in state court. *Haines* and other cases label these terminations as "non-collusive". *Haines,* 178 B.R. at 475; *see also 130/40 Essex St. Dev. Corp. v. City of New York (In re 130/40 Essex St. Dev. Corp.)*, No. 04-02978, 2008 Bankr. LEXIS 4017 (Bankr. S.D.N.Y. Oct. 22, 2008). The Committee attempts to distinguish the termination agreement in this case, and implies that it is the type of collusive transaction that can be avoided under *Haines* and *Egyptian Bros.* But "collusion" is defined as "An agreement to defraud another or to do or obtain something forbidden by law." *Black's Law Dictionary* 281 (8th ed. 2004). And Webster's Dictionary provides the following definition: "A secret agreement between two or more persons for a fraudulent or deceitful purpose." *Webster's II New College Dictionary* 226 (3rd ed. 2005); *see also 718 Arch St. Assocs. v. Blatstein (In re Blatstein)*, 226 B.R. 140, 149 n.11 (E.D. Pa. 1998) ("A 'collusive' transaction is defined generally as one involving 'secret cooperation for a fraudulent or deceitful purpose.'") The Court concludes that the termination agreement was non-collusive under these definitions.

First, the lease termination agreement was not forbidden by law. In fact, Wisconsin law recognizes the validity of written termination agreements. Section 704.03 of the Wisconsin Statutes provides that "[a]n agreement to terminate a tenancy more than one year prior to the expiration date specified in a valid written lease is not enforceable unless it is in writing signed by both parties." Both parties to the subleases signed the lease termination agreement and terminated the subleases in accordance with this statute.

9

Second, there is no evidence of a fraudulent or deceitful purpose in the lease termination agreement. While admitting that rent, real estate taxes and deferred maintenance obligations were due on the subleases, the Committee disputes that the Debtor was in default. However, the Debtor's president, Wheat, certainly thought that a default existed and that T.D. was going to evict the Debtor. When considering the Store 22 and Store 25 Subleases as part of the group that was being negotiated by Theisen, the picture is even clearer. The Committee ignores the other subleases and tries to view Store 22 and Store 25 in a vacuum. But Wheat and Theisen regarded the five stores as a package deal. As Wheat explained in his February 9, 2012 email seeking approval for the termination agreement:

> We have been in discussions with John Theisen and Tom Chambasian who represent the owner and landlord positions for 5 units in our operation. . . . 3 of the units lose money and 2 units produce a small profit, however, the 2 stores that produce any income are short term leases with one expiring in 2 years, and the other in 3 years. We currently have $30,809 outstanding in past due rents as well as $19,053 outstanding in Real Estate taxes; and the group is pursuing litigation. We have discussed with them a settlement which would allow termination of all 5 leases, a write off of all amounts owed, past & future, agreement of a mutual release of all claims, and this also would include a confidentiality agreement. . . . Another point as to the economics, 3 of the stores have repairs required that we have so far put off. Because we are giving the stores back 'as is' we would be saving approx. $80,000 in these repairs. This will also eliminate all ties with this ownership group now and for the future. I recommend that you agree and give approval for this transaction.

(Trial Exhibit 32, ECF 46-32 at 2-3.) The Debtor had been experiencing financial difficulties and had closed 40 stores. (Amended Motion to Reject Leases, 12-24163-svk, ECF 48.) The proposal to terminate these subleases appears reasonable and in the Debtor's best interest. By entering into the agreement, the Debtor would not have to face an eviction proceeding and would be relieved of thousands of dollars in obligations for rent, taxes and deferred maintenance. Although Stores 22 and 25 produced a small profit, this was more than offset by the benefits of surrendering those stores along with the other unprofitable locations.

In determining that a lease termination was non-collusive, the court in *130/40 Essex St.* noted: "There is absolutely no evidence that the termination resulted from any collusion between the Debtor and the City designed to benefit themselves and prevent creditors from reaching the Debtor's assets." 2008 Bankr. LEXIS 4017, at *15-16. And in *Metro Water & Coffee*, the court said that there were no allegations that the termination was due to collusion "designed to bring about a financial benefit to one of the parties to the prejudice of the Debtor's estate or its creditors." 157 B.R. at 746. In this case, evidence of collusion is similarly absent. Instead, the Debtor and T.D. engaged in arms-length negotiations to terminate the subleases, and the Debtor was able to avoid eviction and continue to attempt to save its more profitable stores from bankruptcy. The record does not indicate that T.D. gained any windfall from the termination agreement at the expense of the Debtor's other creditors. In fact, T.D. was unable to operate the stores profitably, and they were both closed by November 1, 2014. (Trial Audio 10:16:55 – 10:17:41.) It is pure speculation that if the Debtor had not terminated the Store 22 and Store 25 subleases, those subleases could have been assumed and assigned for a profit in the Chapter 11 case. In short, the lease termination agreement was valid and non-collusive, and as such should not be set aside as a preference or fraudulent transfer.

## IV.  Effect of rejection of the subleases

A final reason that the Committee should fail in its efforts to avoid the lease termination agreement is the fact that, after due notice and no objections, the Debtor rejected the subleases in the Chapter 11 case. The Committee's Complaint alleges that the value of the terminated subleases is $825,000. However, in the amended motion to reject leases, the Debtor represented that the subleases, along with others that the Debtor sought Court approval to reject, were not necessary to the Debtor's reorganization and a burden on the estate. (12-24163-svk, ECF 48.)

11

The Debtor provided notice and the opportunity for parties in interest to object to the rejection of the leases listed in the amended motion. No objections were filed.

As "terminated" leases, the subleases for Stores 22 and 25 were not technically "rejected" under Bankruptcy Code § 365. Since they were terminated prior to the petition, there was nothing remaining for the Debtor to assume or reject. *See Moody v. Amoco Oil Co.,* 734 F.2d at 1214. However, the Debtor's amended motion specifically identified the terminated subleases and offered parties in interest the opportunity to challenge the Debtor's business judgment in entering into termination agreements. If the subleases really were worth $825,000, the Committee certainly could have objected to the Debtor's amended motion (or sought more time for discovery). Having failed to object or appeal the Court's order approving the Debtor's amended motion, a strong argument exists that the Committee is estopped from claiming that the terminated subleases had significant value that should now be recognized for the Debtor's estate.

## CONCLUSION

Even assuming that the lease termination agreement is a transfer, it is not an avoidable transfer. The termination agreement is valid under Wisconsin law, and the subleases were terminated under applicable nonbankruptcy law prior to the petition. Accordingly, under Bankruptcy Code § 365(c)(3), the subleases could not be assumed by the Debtor in the Chapter 11 case. Although the parties dispute whether the subleases were in default, the termination agreement was a non-collusive agreement that reflected appropriate business judgment on the Debtor's part, and the agreement was not engineered to produce a windfall or financial gain to either party at the expense of the Debtor's creditors. The termination of the subleases was brought to the Committee's attention as part of the Debtor's lease rejection motion, and the

Committee did not object. This provides further support for the Court's conclusion that the termination agreement should not be avoided as a fraudulent transfer or a preference.

The Court will enter a separate order denying the relief requested in the Complaint and dismissing this adversary proceeding.

Dated: April 13, 2015

By the Court:

*Susan Kelley*
Susan V. Kelley
Chief U.S. Bankruptcy Judge