UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| In re<br>Great Lakes Quick Lube<br>Limited Partnership,<br>                     Debtor. | Chapter 11<br><br>Case No. 12-24163-svk |
| Official Committee of Unsecured Creditors<br>of Great Lakes Quick Lube, L.P.,<br>                     Plaintiff,<br>v.<br><br>T.D. Investments I, LLP,<br>                     Defendant. | Adversary No. 13-02709 |

**MEMORANDUM DECISION**

This case involves the valuation of leasehold interests that were terminated on the eve of the Debtor's Chapter 11 case. Great Lakes Quick Lube Limited Partnership (the "Debtor") operated a number of Valvoline Instant Oil Change stores. On February 10, 2012, the Debtor entered into a lease termination agreement terminating two subleases with T.D. Investments I, LLP ("TD"). (Docket No. 46-1.)[1] Under the agreement, in exchange for vacating the subleased premises, TD agreed to release the Debtor from delinquent rent and real estate taxes. The parties stipulated that $46,110 was forgiven under the lease termination agreement. (Stipulated Facts, Docket No. 53 at 4.)

On April 2, 2012, the Debtor filed a Chapter 11 petition. Pursuant to powers granted under the confirmed plan, the Official Committee of Unsecured Creditors (the "Committee") filed an adversary complaint against TD alleging that the lease termination agreement was

---

[1] All references are to the docket in this adversary proceeding, except as noted in the discussion of documents filed in Case No. 12-24163 (the "Main Case").

avoidable as a preferential transfer under 11 U.S.C. § 547 or as a constructively fraudulent transfer under § 548(a)(1)(B). The Committee sought to recover the value of the leasehold interests under § 550(a).

After a trial, the Court ruled that the termination did not constitute an avoidable transfer. On direct appeal, the Seventh Circuit Court of Appeals reversed. It determined that the termination constituted a "transfer" for the purposes of § 547(b) and § 548(a)(1)(B). *See Official Comm. of Unsecured Creditors of Great Lakes Quick Lube LP v. T.D. Invs. I, LLP (In re Great Lakes Quick Lube LP)*, 816 F.3d 482 (7th Cir. 2016). The Court of Appeals remanded for this Court to "determine the value of Great Lakes' transfer to TD and whether TD has any defenses to the creditors' claims." *Id.* at 486.

After the remand, the Committee filed a motion to reopen the record to conduct discovery and submit new evidence about the value of the leases. (Docket No. 86.) TD objected. The parties briefed the issue, and after a hearing, the Court permitted the Committee to conduct discovery. (Docket No. 102.) The Court invited the parties to file whatever submissions they deemed appropriate to assist the Court in determining whether to supplement the record, schedule an evidentiary hearing, or determine the issues without further hearing. (Docket No. 114.) The Committee took the position that the record should be reopened only if the Court considered evidence about the performance of the stores after the transfer. (Docket No. 116 at 13-14.) TD had presented some evidence about the post-transfer operation of the stores at the trial, but in its brief after remand, TD conceded that the date of the transfer is the only relevant time to measure equivalent value. (Docket No. 130 at 5-6.) The Committee concluded it was not necessary for the Court to reopen the record and asserted the matter could be decided based

on the briefs. (Docket No. 131 at 9.) Accordingly, the Court issues this decision without reopening the record.

In their briefing following the remand, the Committee and TD have focused on whether the lease termination agreement was a constructively fraudulent transfer under the Bankruptcy Code.[2] The single disputed element is whether the Debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation." 11 U.S.C. § 548(a)(1)(B)(i). The parties agree that "[t]he test used to determine reasonably equivalent value in the context of a fraudulent conveyance requires the court to determine the value of what was transferred and to compare it to what was received." *Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997). The Committee has the burden of proof, and whether a debtor received reasonably equivalent value depends on all of the facts of the case. *Id.*

The parties also agree that the time of the transfer is the appropriate measurement date. *See Baldi v. Lynch (In re McCook Metals, L.L.C.)*, 319 B.R. 570, 589 (Bankr. N.D. Ill. 2005) (equivalent value is determined at the time of the transfer, not through hindsight); *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002). And the parties stipulated that the Debtor received forgiveness of $46,110 in delinquent rent and real estate taxes under the lease termination agreement and therefore received that amount in value. (*See* Docket No. 53.) The parties are diametrically opposed on the value TD received in exchange.

At trial, the Committee's business valuation expert, Bryan Browning, provided his opinion as to the "business enterprise value" lost by the Debtor over the remaining term of the

---

[2] Since the Court ultimately concludes that the Debtor did not receive reasonably equivalent value from TD under the lease termination agreement and it was a constructively fraudulent transfer, the Court does not reach the issue of whether the transfer was avoidable as a preference. (*See* Brief, Docket No. 131 at 8.)

3

leases, including an option period. (Transcript, Docket No. 81 at 145:1-6.) He suggested two values: a higher one that did not include contingent expenses, such as the Valvoline franchise fee and repairs, and a lower one that considered contingent expenses. (*Id.* at 128:14-24.) To arrive at his values, he reviewed historical operating results to forecast future sales and subtracted the cost of goods sold and administrative expenses based on historical averages. He also subtracted the rental expenses, increasing them in accordance with the terms of the leases. Converting the resulting operating profit or earnings before interest, taxes, depreciation, and amortization (EBITDA) to cash flow and discounting to present value, he arrived at an overall business enterprise value of $310,000 for the Brookfield store. (*Id.* at 128:25 – 131:19.) Subtracting contingent expenses like capital repairs and Valvoline franchise fees, he established a value of $294,000. (*Id.* at 131:20 – 132:10, 134:11 – 134:22.) Mr. Browning performed the same analysis for the Highway 100 store. Excluding contingent expenses, the business enterprise value was $140,000, and including the contingent expenses, the value was $33,000. (*Id.* at 135:3 – 136:6.) In reaching his conclusions, Mr. Browning solely relied on the lost business enterprise value, and he did not conduct a fair market valuation of the leases. (*Id.* at 145:23 – 146:5.)

      Walter Simson was the Debtor's turnaround consultant who became its chief restructuring officer in the bankruptcy case. As such, he was involved in the Debtor's sale of leased stores and in the Debtor's decision to maintain certain core stores. (Transcript, Docket No. 81 at 161:18 – 164:18.) Over TD's strong objection, he also testified as to value. For the Brookfield store, he said that he looked at actual sales during the bankruptcy case which ranged from multiples of 2.4 times to 3.8 times EBITDA for the 12 months before the transaction. (*Id.* at 177:3 – 179:3.) He chose the lower end of the range and arrived at a value of $149,000. The Highway 100 store presented a "particular challenge." (*Id.* at 179:8.) Mr. Simson explained that

4

Case 13-02709-svk    Doc 132    Filed 05/23/17    Page 4 of 11

due to the short remaining lease term, the store was not saleable. He therefore estimated the value of the Highway 100 store as the net profit over the two and a half years remaining on the Debtor's lease, approximately $150,000 to $180,000. (*Id.* at 179:4 – 180:11.) Using Mr. Browning's higher value for the Brookfield store and Mr. Simson's higher value for the Highway 100 store, the Committee concludes that the combined "value of the leases to [the Debtor] was $490,000." (Brief, Docket No. 116 at 10.)

In support of its valuation testimony, the Committee argues that "[w]hen assets have value as an ongoing business, that value is usually determinative when considering a fraudulent transfer." (Docket No. 116 at 6.) The Committee relies on an article citing a short opinion, *In re Western Adams Hospital Corporation*, 609 F.2d 929 (9th Cir. 1979). That case affirmed the bankruptcy court's determination that in determining whether a debtor is insolvent, an operating debtor's assets should be valued as a going concern. It did not hold that business enterprise value is the appropriate measure to determine whether a debtor received reasonably equivalent value for a terminated lease. The article also recognizes that "[c]ourts have generally employed a case-by-case approach in assessing reasonably equivalent value while observing the unfairness of applying mechanical tests." Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law*, 8 Bankr. Dev. J. 55, 79-80 (1991). As the Seventh Circuit stated in *Barber*, 129 F.3d at 387, to determine reasonably equivalent value, a court must determine the value of what was transferred and compare it to what was received. The appropriate valuation approach in the first step of the analysis necessarily depends on the character of what was transferred.

The Committee also cites *Executive Benefits Insurance Agency v. Arkison (In re Bellingham Insurance Agency)*, 702 F.3d 553, 571 (9th Cir. 2012) for the proposition that "[t]he

5

Case 13-02709-svk    Doc 132    Filed 05/23/17    Page 5 of 11

due to the short remaining lease term, the store was not saleable. He therefore estimated the value of the Highway 100 store as the net profit over the two and a half years remaining on the Debtor's lease, approximately $150,000 to $180,000. (*Id.* at 179:4 – 180:11.) Using Mr. Browning's higher value for the Brookfield store and Mr. Simson's higher value for the Highway 100 store, the Committee concludes that the combined "value of the leases to [the Debtor] was $490,000." (Brief, Docket No. 116 at 10.)

In support of its valuation testimony, the Committee argues that "[w]hen assets have value as an ongoing business, that value is usually determinative when considering a fraudulent transfer." (Docket No. 116 at 6.) The Committee relies on an article citing a short opinion, *In re Western Adams Hospital Corporation*, 609 F.2d 929 (9th Cir. 1979). That case affirmed the bankruptcy court's determination that in determining whether a debtor is insolvent, an operating debtor's assets should be valued as a going concern. It did not hold that business enterprise value is the appropriate measure to determine whether a debtor received reasonably equivalent value for a terminated lease. The article also recognizes that "[c]ourts have generally employed a case-by-case approach in assessing reasonably equivalent value while observing the unfairness of applying mechanical tests." Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law*, 8 Bankr. Dev. J. 55, 79-80 (1991). As the Seventh Circuit stated in *Barber*, 129 F.3d at 387, to determine reasonably equivalent value, a court must determine the value of what was transferred and compare it to what was received. The appropriate valuation approach in the first step of the analysis necessarily depends on the character of what was transferred.

The Committee also cites *Executive Benefits Insurance Agency v. Arkison (In re Bellingham Insurance Agency)*, 702 F.3d 553, 571 (9th Cir. 2012) for the proposition that "[t]he

transfer of an ongoing business concern can constitute a fraudulent transfer." But as TD observes, the lease termination agreement was not such a transfer.

TD counters that the Committee's valuations do not reflect the reality of the transaction. TD calls the Committee's focus on lost business value irrelevant because no business was transferred by the Debtor. (Brief, Docket No. 130 at 2.) Moreover, TD notes that Valvoline franchises were not maintained at the locations; after the leases were terminated, the Debtor transferred those franchises and their benefits to other stores. As TD points out: "the business enterprise, including the Valvoline franchise, its customers, its customer list, franchise signs, accounts receivable, equipment, etc. were not included in the transfer." (*Id.* at 14.)

The Court agrees with TD that the Committee's valuations are misplaced. First, Mr. Browning never actually testified that calculating the "lost business enterprise" value is a recognized method for appraising a terminated leasehold interest. While this methodology may be appropriate to value an operating business, TD did not receive the transfer of such a business in the lease termination agreement. Rather, TD received its empty subleased property. The Debtor took the employees, Valvoline franchise rights, customer lists, signs and inventory and moved them to another store. If this case involved the transfer of an ongoing business, Mr. Browning's valuation may have supported the Committee's position. But the Court finds the method highly speculative and unconvincing to determine the value of a terminated lease.

Mr. Simson's valuations are also unpersuasive. He admitted that during the bankruptcy, store sales were generally accomplished in packages of multiple stores, and these leases could not be packaged. (Transcript, Docket No. 81 at 178:6-16.) Nevertheless, since the Brookfield store lease included an option that extended until 2025, Mr. Simson opined that the Brookfield store could be sold based on a multiple of EBITDA on the lower end of the range.

6

First, the Court's review of the docket in the Debtor's Chapter 11 case does not confirm that sales occurred in the range recalled by Mr. Simson. The Debtor negotiated four sales of multiple stores. (Main Case Docket Nos. 538 at 16, 538-1 at 7.) According to the sale motion, the Debtor proposed to sell four stores in Kentucky at a price representing 3.77 times EBITDA. (Main Case Docket No. 289.) The Debtor sold several stores in Indiana based on a multiple of 3.98 times EBITDA. (Main Case Docket No. 305.) Another sale motion sought to sell five locations in Iowa for a multiple of 3.9 times EBITDA. (Main Case Docket No. 311.) The purchase price for eleven locations in St. Louis, Evansville and the Quad Cities was $715,000 or 3.57 times EBITDA. (Main Case Docket No. 306.) The documents filed in the Debtor's bankruptcy case do not support Mr. Simson's range of 2.4 to 3.8 times EBITDA.

Even if Mr. Simson's testimony tracked with the actual sale prices, a more important defect in his analysis is that he compared apples to oranges. For example, the amended asset purchase agreement ("APA") for the Indiana stores shows that in addition to the leasehold interests, the Debtor sold "equipment, Usable Bulk Inventory . . . , contract rights, goodwill, tools, shop and office supplies, furniture, and fixtures." (Main Case Docket No. 426 at 1.) Moreover, the APA was contingent on Valvoline delivering the customer list for each store for the last three years, "which shall include for each such customer its name, address, telephone number, email address, and maintenance history." (*Id.* at 2, 4.) Similarly, the Iowa sale involved "substantially all of the assets relating to or used in connection with the operation of" the stores, and the sale was subject to Valvoline's approval, as the buyer intended to operate as a Valvoline franchisee. (Main Case Docket No. 311 at 5, 6.) The St. Louis, Evansville and Quad Cities sale included customer lists and special provisions for the buyer to obtain signs and equipment. (Main Case Docket No. 306 at 6.) Valvoline's consent was required for the Kentucky sale,

7

because the buyer intended to act as a Valvoline franchisee, and all usable inventory was included in the sale, along with substantially all of the Debtor's other personal property at those locations.  (Main Case Docket No. 289 at 5-6.)

By contrast, TD did not receive the customer lists or personal property as part of the lease termination agreement, and TD did not have the opportunity to operate as a Valvoline franchisee.  Instead, TD received the Brookfield property back in a condition that John Theisen, TD's corporate representative, testified was a "mess of waste oil throughout the four bays, as much as three-quarters of an inch.  TD paid for that cleanup."  (Transcript, Docket No. 82 at 62:17-18.)  Unlike the sales during the bankruptcy case, the lease termination agreement contemplated that the Debtor would remove all the Valvoline computers, software and printers, as well as all of the Debtor's personal property and inventory.  (Docket No. 46-1.)  Jimmy Wheat, the Debtor's president, testified that the Debtor had built up a loyal clientele who trusted their mechanics at the Brookfield and Highway 100 locations, and the Debtor placed those mechanics and store managers at other locations.  (Transcript, Docket No. 81 at 66:8-13.)  He also testified that the Debtor gave up the Valvoline license at the locations, and that the Debtor had never tried to sell a location without a Valvoline license.  (*Id.* at 69:3-11.)  Dorothy Ramsey, the Debtor's chief financial officer, testified that the Debtor did not transfer the customer lists for the stores to TD, but kept those lists for other locations.  (*Id.* at 118:20-24.)  Assets other than the leases, such as customer lists, Valvoline signs and systems and inventory, clearly were important components of the Debtor's bankruptcy sales.  But the lease termination agreement involved only the surrender of the leased premises.  Based on these discrepancies, the Court rejects Mr. Simson's valuation of the Brookfield lease.  The vast differences between the sales that occurred during the bankruptcy case and the termination of that lease compel no other conclusion.

8

And Mr. Simson's value of the Highway 100 store was even less reliable. The lease had about two years to run, and the store was not saleable. But Mr. Simson speculated that if the mechanism were "available to maintain the operation, I would have seen that as being an opportunity to take the cash flow from the Highway 100 lease and bring it into the estate." (Transcript, Docket No. 81 at 184:15-19.) Then, without considering the cost of the mechanism to maintain the operation or providing a satisfactory explanation of how the opportunity translated to the value of the terminated leasehold interest, Mr. Simson stated that the fair market value was "Something like three times cash flow, and depending on what your view of future cash flow is, anywhere from $180 to, depending on if the company is a taxpayer, to $90,000 a year, so two and a half times that, $240,000, something like that." (*Id.* at 184:19-23.) On cross-examination, Mr. Simson admitted that using a "conventional approach" to valuing the Highway 100 store, the value would be zero. (*Id.* at 189:20 – 190:1.)

Over TD's strenuous objection, the Court permitted Mr. Simson to testify as an owner of the property as to the value of the leases. *See In re Levitt & Sons, L.L.C.*, 384 B.R. 630, 645-47 (Bankr. S.D. Fla. 2008). At the time, the Court noted that the weight of his testimony would be treated appropriately. The Court now rejects Mr. Simson's valuation testimony as unconvincing.

TD argues that the value of a leasehold interest should be determined by the amount of net rent or profit compared to fair market rental value of the premises. (Brief, Docket No. 130 at 10.) Case law provides examples of courts employing this methodology. *See In re Edward Harvey Co.*, 68 B.R. 851, 856 (Bankr. D. Mass. 1987) (valuing leasehold interest using the present value of the difference between the contract rent and the market rent for the remaining term of the lease, including a five-year option, to determine whether a fraudulent transfer occurred). In *Sharp v. Chase Manhattan Bank USA, N.A. (In re Commercial Fin. Servs.)*, 350

B.R. 520 (Bankr. N.D. Okla. 2005), the court analyzed expert testimony concerning the debtor's solvency in a fraudulent transfer case. The expert valued the debtor using an adjusted net asset value approach, and leases comprised one component of the debtor's assets. The court quoted a valuation treatise on how to value leases as assets or liabilities: "The general method for determining leasehold value is to compute the present value of the difference between the lease payments under the lease and a market lease payment over the remaining term of the lease agreement." *Id.* at 537 (quoting 2 Jay Fishman, Shannon Pratt & J. Clifford Griffith, *PPC's Guide to Business Valuations* ¶ 702.7 (15th ed. 2005)). To emphasize the point, the court quoted another expert: "the fair market value of the lease is usually determined as the discounted present value of the future benefits to the lessee. This is the difference between the market rent and the actual rent being paid." *Id.* (quoting Gary R. Trugman, *Understanding Business Valuation* (AICPA 2d ed.)). This methodology is more appropriate than Mr. Browning's business enterprise valuation and Mr. Simson's valuation, because it reflects what the Debtor actually lost: the ability to continue to rent the premises for the rent payable under the lease. And this mirrors what TD received: the premises themselves. The Debtor did not lose all of the benefits of the operating business, as it took the customer lists, mechanics, Valvoline license and other trappings of the operation to new locations. Since the Debtor retained those benefits, the Debtor and its creditors did not lose the value of the benefits when the Debtor agreed to terminate the leases. Accepting TD's proposed methodology, TD may have received a fraudulent transfer if the Debtor's leases were below-market leases and the transfer of the leasehold interests gave TD the ability to re-lease the premises at market rate.

  TD points out that both the Debtor's president and chief financial officer testified that they believed the Debtor was paying fair market rent. (Brief, Docket No. 130 at 17; Trial

10

Transcript, Docket No. 81 at 66:24 – 67:6, 120:2-10.) However, the evidence shows that after the lease termination agreement, TD entered into oral lease agreements with a new tenant at a higher rent, implying that the Debtor was paying less than fair market rent. (Stipulation of Facts, Docket No. 53 at ¶ 26-27; Transcript, Docket No. 81 at 91:3-25.) In its post-trial brief, using the present value calculations from Mr. Browning's analysis, the Committee posited that over the time remaining on the leases, the new leases would allow TD to receive $57,000 more than the present value of the Debtor's rent payments. (Docket Nos. 59 at 15; 59-1.) The Court adopts this valuation measure and its result and determines that the value of the subleases on the date of the transfer was $57,000. Subtracting the $46,110 in past due rent and unpaid taxes that was forgiven under the lease termination agreement, TD received a constructively fraudulent transfer in the amount of $10,890. Judgment on the Committee's § 548 claim will be entered accordingly.

Dated: May 23, 2017

By the Court:

Susan V. Kelley
Chief U.S. Bankruptcy Judge